1
2
3
4            UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7  CALIFORNIA COUNCIL OF THE BLIND,         Case No.  13-cv-03443-JCS
   et al.,

8                Plaintiffs,

9        v.                                 **ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'
10 COUNTY OF ALAMEDA, et al.,                MOTION TO DISMISS**

11               Defendants.                **Dkt. No. 8**

12

13 **I.      INTRODUCTION**

14         This action is brought by five blind registered voters of the County of Alameda, as well as

15 California Council of the Blind, a membership organization of blind and visually impaired

16 individuals (collectively, "Plaintiffs").  Defendants are the County of Alameda and Tim Dupuis, in

17 his official capacity as the Interim Registrar of Voters for the County of Alameda ("Defendants").

18 Plaintiffs allege that in the last two elections, Defendants failed to ensure that voting machines

19 accessible to the blind and visually impaired could be activated and operated by poll workers, and

20 therefore required these individuals to vote with the assistance of third parties in violation of Title

21 II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, § 504 of the Rehabilitation

22 Act, 29 U.S.C. § 794, as well as California Election Code § 19227 and California Government

23 Code § 11135.  Defendants filed a Motion to Dismiss ("Motion") under Rule 12(b)(1) and (6) of

24 the Federal Rules of Civil Procedure.  The Court held a hearing on the Motion on October 11,

25 2013, at 1:30 p.m.  For the reasons stated below, the Motion to Dismiss is GRANTED in part and

26 DENIED in part.[1]

27 _____

28     [1] The parties have consented to the jurisdiction of the undersigned magistrate judge
   pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.      BACKGROUND

### A.      Factual Allegations

Plaintiffs allege that advancements in technology make it possible for blind and visually impaired individuals to vote privately and independently just as sighted voters do.  Complaint ("Compl.") ¶ 4.  Sequoia AVC Edge electronic voting machines ("accessible voting machines") utilize electronic ballots and possess an audio ballot feature that can read aloud instructions and voting options.  *Id*. ¶ 31.  When a tactile keyboard and headphones are connected to an accessible voting machine and the audio ballot is functioning properly, a blind voter can use the audio ballot feature and the tactile keypad to privately and independently complete and submit a ballot.  *Id*.

In the past several public elections, the County of Alameda has provided at least one of these accessible voting machines at each of its polling sites.  *Id*. ¶ 31.  In fact, it is required to do so by California and federal law.  *Id*. ¶¶ 4, 7.  The Help America Vote Act ("HAVA"), 42 U.S.C. § 15301 *et seq.*, which came into effect January 1, 2006, requires every voting site in federal elections to provide at least one accessible voting machine that includes "nonvisual accessibility for the blind and visually impaired in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters[.]"  *Id*. § 15481(a)(3)(A)-(B).  Similarly, California Elections Code § 19227 requires, subject to available funds, the provision of at least one voting machine at each polling site that enables the blind and visually impaired "to cast and verify all selections made by both visual and nonvisual means."  Cal. Elec. Code § 19227.

According the Plaintiffs, the fact County of Alameda has provided accessible voting machines during the last two election cycles is insufficient.  Plaintiffs allege that counties must take affirmative steps to ensure that accessible voting machines are fully operational at all polling sites from the moment the sites open on Election Day to the moment they are closed.  *Id*. ¶ 6. Such affirmative steps, according to Plaintiffs, require counties to provide adequate training of poll workers on the appropriate set up and use of the machines, conduct adequate testing of each machine and the accessible features prior to opening the polling site, provide timely and skilled technical support services to poll-site staff, deploy replacement machines as needed in a timely

1    manner, investigate non-functioning machines to determine the cause of the problems that arise,

2    and identify and implement solutions to such problems.  *Id*.

3         Plaintiffs allege that the County of Alameda has failed to take such affirmative steps to

4    ensure that accessible voting machines functioned properly during the November 6, 2012 Election.

5    As a result, multiple blind voters were denied their right to vote privately and independently at

6    multiple poll sites.  *Id*. ¶ 32.  On November 6, 2012, the five Plaintiffs in this action each tried to

7    vote privately and independently at four different polling sites using an accessible voting machine.

8    *Id*. ¶¶ 11, 17-21.  At each site, however, poll workers were unable to make the audio ballot feature,

9    tactile keypads, and/or other accessible features of the machines function properly.  *Id*.  In the end,

10   each of the five Plaintiffs was required to vote with the assistance of a third party, either a poll

11   worker or a family member, if they were to vote at all.  *Id*. ¶¶ 17-21.

12        Before voting with the assistance of a third party, three of the Plaintiffs attempted to use an

13   accessible voting machine at another polling site.  Plaintiff Martinez's designated polling site was

14   the Kennedy Community Center in Union City.  *Id*. ¶ 18.  Plaintiff Martinez was sent to use the

15   accessible voting machine at the Union City Library when the audio ballot feature and tactile

16   keypad could not be activated for the Kennedy Community Center's accessible voting machine.

17   Plaintiff Martinez returned to the Kennedy Community Center when the same problem arose at the

18   Union City Library.  *Id*.

19        Plaintiffs Rueda and Bunn had designated polling sites at the Ceasar Chavez Middle

20   School in Union City.  *Id*. ¶¶ 20-21.  When poll workers were unable to activate the audio ballot

21   feature on either of the two accessible machines, Plaintiffs Rueda and Bunn were driven together

22   to another polling site at a private home one mile away.  However, they returned to Ceasar Chavez

23   Middle School when the poll workers at the private home were also unable to activate the audio

24   ballot feature for that site's accessible voting machine.  *Id*.

25        Plaintiffs further allege that Defendants did not adequately respond when the accessible

26   voting machines at various polling sites malfunctioned.  For instance, a poll worker at The Bridge

27   of Faith Fellowship Hall polling site in Hayward called the County Registrar's troubleshooting

28   line after trying to activate the audio ballot feature of the accessible voting machine so Plaintiff

United States District Court
Northern District of California

3

1   Gardner could vote privately and independently. *Id.* ¶ 19. After some difficulty getting through to

2   the troubleshooting line, someone from the County Registrar's office informed Plaintiff Gardner

3   that she would have to wait for two hours for a replacement voting machine, with no guarantee

4   that the accessible features would be able to function properly in the end. *Id.*

5         The Complaint alleges that the County's failure to ensure that the accessible features of its

6   voting machines are functioning on Election Day is a result of its failure to: (1) develop and

7   implement policies to ensure that its staff are trained on appropriate use and setup of its accessible

8   voting machines; (2) ensure that its staff properly maintain and test the accessible features of such

9   machines; and (3) maintain an adequate troubleshooting, maintenance, and replacement machine

10  deployment system to ensure the functionality of its machines on Election Day. *Id.* ¶ 36.

11        **B.      Causes of Action**

12        Plaintiffs assert four causes of action in the Complaint. Plaintiffs allege that the foregoing

13  constitutes a violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

14  12131, *et seq.*, as well as § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation

15  Act"). Plaintiffs also assert two state law claims under California Election Code § 19227 and

16  California Government Code § 11135.

17        **C.      Motion to Dismiss**

18        Defendants argue that Plaintiffs fail to state a claim under Title II of the ADA or § 504 of

19  the Rehabilitation Act. Defendants' Notice of Motion and Motion to Dismiss Plaintiffs'

20  Complaint Pursuant to Rule 12(b)(1), (6) ("Motion"). Defendants contend that nothing in the

21  ADA or the Rehabilitation Act create a right to vote privately and independently, and because

22  Plaintiffs allege that they were able to vote with the assistance of a third party, they fail to state a

23  claim under the ADA or the Rehabilitation Act as a matter of law. Defendants urge the Court to

24  decline to exercise supplemental jurisdiction over the state law claims, and argue that in any event,

25  Plaintiffs fail to state a claim under California Election Code § 19227 and California Government

26  Code § 11135.

27        Plaintiffs oppose Defendants' Motion on all grounds. Plaintiffs' Opposition to

28  Defendants' Motion to Dismiss Plaintiffs' Complaint Pursuant to Rule 12(b)(1), (6)

United States District Court
Northern District of California

4

("Opposition").

## III.    LEGAL STANDARD

A complaint may be dismissed for failure to state a claim for which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Fed.R.Civ.P. 12(b)(6).  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star. Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  In ruling on a motion to dismiss under Rule 12(b)(6), the Court takes "all allegations of material fact as true and construe(s) them in the lights most favorable to the non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1990).  The complaint need not contain "detailed factual allegations," but must allege facts sufficient to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

## IV.    DISCUSSION

### A.    Legal Standard – Discrimination under the ADA and Rehabilitation Act

Section 504 of the Rehabilitation Act and Title II of the ADA are similar in purpose and scope.  Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance….

29 U.S.C. § 794(a).  For purposes of this Motion, Plaintiffs' claims under § 504 of the Rehabilitation Act and Title II of the ADA may appropriately be considered together.[2]

---

[2] The Ninth Circuit has observed that, "on occasion … 'there is no significant difference in the analysis of rights and obligations created by the two Acts.' "  *K.M. ex rel. Bright v. Tustin*

1    To plead a cause of action under Title II of the ADA and § 504 of the Rehabilitation Act, a

2  plaintiff must allege three elements: (1) that he or she is a "qualified individual with a disability";

3  (2) that he or she was "excluded from participation in or denied the benefits of a public entity's

4  services, programs or activities, or was otherwise discriminated against by the public entity"; and

5  (3) that "such exclusion, denial of benefits, or discrimination was by reason of his [or her]

6  disability." *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir.

7  1997). In the Motion to Dismiss, Defendants only argue that Plaintiffs fail to establish the second

8  element−that they were "excluded from participation in or denied the benefits of a public entity's

9  services, programs or activities, or [were] otherwise discriminated against by the public entity."

10  *Id.*; *see* Motion at 5.

11    The Ninth Circuit has broadly construed the scope of both the Rehabilitation Act and the

12  ADA based on the text of the statute and legislative history. The Rehabilitation Act covers "any

13  program or activity receiving Federal financial assistance," and "defines 'program or activity' as

14  'all of the operations of' a qualifying local government." 29 U.S.C. § 794(a); *Barden v. City of*

15  *Sacramento*, 292 F.3d 1073, 1076-77 (9th Cir. 2002) (quoting 29 U.S.C. § 794(b)(1)(A)). "The

16  legislative history of the ADA similarly supports construing the language generously, providing

17  that Title II … 'simply extends the anti-discrimination prohibition embodied in section 504 [of the

18  Rehabilitation Act] *to all actions of state and local governments.*' " *Barden*, 292 F.3d at 1077

19  (quoting H.R.Rep. No. 101-485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367)

20

---

21  *Unified Sch. Dist.*, 725 F.3d 1088, 1098 (9th Cir. 2013) (quoting *Vinson v. Thomas*, 288 F.3d

22  1145, 1152 n. 7 (9th Cir. 2002)). Indeed, "Congress used the earlier-enacted Section 504 as a
model when drafting Title II." *K.M.*, 725 F.3d at 1098 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d

23  1124, 1135 (9th Cir. 2001)). In *K.M.*, the Ninth Circuit identified the two main "material
differences between the statutes" as: (1) non-coextensive jurisdictions, as "Section 504 governs all

24  entities receiving federal funds (public or private), while Title II governs all public entities
(federally funded or not)"; and (2) a stricter causal standard in the Rehabilitation Act, which

25  requires a plaintiff "to show a denial of services '*solely by reason of*' disability, whereas for Title

26  II, "a plaintiff need show only that discrimination on the basis of disability was a '*motivating*
*factor*' for the decision." *K.M.*, 725 F.3d at 1099 (quotations omitted) (emphasis added). Neither

27  party raises either of these differences in their substantive briefing for the Motion. Accordingly,
the Court undertakes one analysis to consider whether Plaintiffs state a claim under both the ADA

28  and the Rehabilitation Act.

United States District Court
Northern District of California

1    (emphasis added in *Barden*).  Therefore, the Ninth Circuit construes "the ADA's broad language

2    as bringing within its scope anything a public entity does."  *Barden*, 292 F.3d at 1076 (quotations

3    and alterations omitted).

4          Both parties note that to determine whether Plaintiffs state a claim under the ADA and

5    Rehabilitation Act, the Court must consider whether Plaintiffs' allegations show they have been

6    denied "meaningful access" to the County's services, programs or activities.  Opposition at 4:1;

7    Reply at 4:19; *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (holding that under § 504 of the

8    Rehabilitation Act, "an otherwise qualified handicapped individual must be provided with

9    *meaningful access* to the benefit that the grantee offers.") (emphasis added).  Indeed, the Ninth

10   Circuit has "relied on *Choate*'s construction of Section 504 in ADA Title II cases, and [has] held

11   that to challenge a facially neutral government policy on the ground that it has a disparate impact

12   on people with disabilities, the policy must have the effect of denying meaningful access to public

13   services."  *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013)

14   ("*K.M.*").  However, when considering the "meaningful access requirement," courts in the Ninth

15   Circuit are guided by the specific implementing regulations of the ADA.  *Id.*

16         The Department of Justice ("DOJ") was required under the ADA to promulgate regulations

17   implementing the ADA.  42 U.S.C. § 12134.  The Ninth Circuit has held that, "under the

18   principles of deference established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council,*

19   *Inc.*, 467 U.S. 837, 104 S.Ct. 2779, 81 Ed.2d 694 (1984), the DOJ's Title II-implementing

20   regulations should be given controlling weight unless they are arbitrary, capricious, or manifestly

21   contrary to the statute."  *K.M.*, 725 F.3d at 1096.  The ADA also mandates that its implementing

22   regulations be "consistent" with certain regulations of the Rehabilitation Act, 42 U.S.C. § 12134,

23   which are not promulgated by the DOJ, but rather the head of each executive agency "as may be

24   necessary[.]"  *See* 29 U.S.C. § 794(a).

25         Several regulations promulgated under the ADA are relevant to this case.  For instance,

26   under the regulation governing "[g]eneral prohibitions against discrimination," public entities are

27   prohibited from "providing any aid, benefit, or service" that "afford[s] a qualified individual with

28   a disability an opportunity to participate in or benefit from the aid, benefit, or service that is *not*

7

1  *equal* to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii) (emphasis added); *see also* 28 C.F.R.

2  § 41.51 (Rehabilitation Act regulations).  Public entities are also prohibited from utilizing

3  "methods of administration … [t]hat have the purpose or effect of defeating or substantially

4  impairing accomplishment of the objectives of the public entity's program with respect to

5  individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3)(ii).  Public entities are required to "make

6  *reasonable modifications* in policies, practices, or procedures when the modifications are

7  necessary to avoid discrimination on the basis of disability, unless the public entity can

8  demonstrate that making the modifications would fundamentally alter the nature of the service,

9  program, or activity." *Id.* § 35.130(b)(7) (emphasis added).

10      Another regulation implementing the ADA, "the so-called 'effective communications

11  regulation,' " *K.M.*, 725 F.3d at 1096, requires public entities to "take appropriate steps to ensure

12  that communications with applicants, participants, members of the public, and companions with

13  disabilities are *as effective* as communications with others." 28 C.F.R. § 35.160(a)(1) (emphasis

14  added).  Under this regulation, public entities are required to "furnish appropriate auxiliary aids

15  and services where necessary to afford individuals with disabilities …. *an equal opportunity to*

16  *participate in, and enjoy the benefits of*, a service, program, or activity of a public entity." 28

17  C.F.R. § 35.160(b)(1).  This regulation further specifies that "[i]n determining what types of

18  auxiliary aids and services are necessary, a public entity shall give primary consideration to the

19  requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2).  It also specifies that "[i]n

20  order to be effective, auxiliary aids and services must be provided in accessible formats, in a

21  timely manner, and in such a way as *to protect the privacy and independence* of the individual

22  with a disability." *Id.* (emphasis added).[3]

23      Furthermore, another Title II regulation governs the "[m]aintenance of accessible

24  features." *See* 28 C.F.R. § 35.133.  Under this regulation, public entities are required to "maintain

25

26  _____

27  [3]  The Ninth Circuit has held that "[i]nsofar as the Title II effective communications regulation has a Section 504 analog, … it is the Section 504 communications regulation at 28 C.F.R. § 39.160, as that is the regulation with which Congress has specified that Title II communications regulations must be consistent." *K.M.*, 725 F.3d at 1100 (citing 42 U.C.S. § 12134(b)).

28

United States District Court
Northern District of California

1   in operable working condition those features of facilities and equipment that are required to be

2   readily accessible to and usable by persons with disabilities by the Act or this part." *Id*. §

3   35.133(a).  Of course, the regulation further specifies that this requirement "does not prohibit

4   isolated or temporary interruptions in service or access due to maintenance or repairs." *Id*. §

5   35.133(b).

6       The Ninth Circuit has interpreted a separate Title II regulation to limit the scope of the

7   other Title II regulations.  *K.M.*, 725 F.3d at 1096 (noting that 28 C.F.R. § 135.164 "limits the

8   application of" the requirements under the effective communications regulation).  Under 28 C.F.R.

9   § 135.164, public entities are not required "to take any action that it can demonstrate would result

10  in a fundamental alteration in the nature of a service, program, or activity or in undue financial and

11  administrative burdens." *See id*.  "The public entity has the burden to prove that a proposed action

12  would result in undue burden or fundamental alteration…." *K.M.*, 725 F.3d at 1096 (citing 28

13  C.F.R. § 135.164).  Thus, the Ninth Circuit has recently summarized the obligation of public

14  entities under Title II as follows:

15
16          Title II and its implementing regulations, taken together, require
            public entities to take steps towards making existing services not
            just accessible, but equally accessible to people with communication
17          disabilities, but only insofar as doing so does not pose an undue
            burden or require a fundamental alteration of their programs.
18

19  *K.M.*, 725 F.3d at 1097.

20      **B.**      **Whether Plaintiffs State a Claim under the ADA and Rehabilitation Act**

21      The Court first considers the parameters of the "service, program, or activity" at issue.  42

22  U.S.C. § 12132.  While Defendants seek to narrowly frame the public service offered by the

23  County of Alameda as "voting," Plaintiffs contend that the County of Alameda provides a broader

24  service for sighted individuals to "vote privately and independently."  This is the underlying issue

25  in Defendants' Motion, as their principal argument is that the ADA and Rehabilitation Act do not

26  provide a right to vote independently and privately.

27      In the preamble to the ADA, Congress wrote that it finds that "discrimination against

28  individuals with disabilities persists in such critical areas as … voting, and access to public

1   service." 42 U.S.C. § 12101 (Findings and Purpose).  Congress never specified that individuals

2   with disabilities face discrimination with regard to voting *privately and independently*.  Nor do the

3   regulations implementing the ADA mention voting at all.  Nevertheless, the Ninth Circuit has

4   instructed that the scope of both the Rehabilitation Act and the ADA should be construed broadly.

5   *Barden*, 292 F.3d at 1076 (construing "the ADA's broad language as bringing within its scope

6   anything a public entity does.") (quotations omitted); *see also* 29 U.S.C. § 794(b)(1)(A) ("any

7   program or activity receiving Federal financial assistance" is defined by the statute as "all of the

8   operations of" a qualifying local government).

9          In *Barden*, the Ninth Circuit reversed the district court's determination that sidewalks are

10  not a "service, program, or activity," and therefore not subject to the ADA's requirements.  *Id*.

11  The court reasoned that even though an ADA regulation did "not specifically address the

12  accessibility of sidewalks, it does address curb ramps[,] … [which] could not be covered unless

13  the sidewalks themselves are covered." *Id*. at 1076.  The Ninth Circuit found support in other

14  circuit court decisions which broadly construed the ADA's coverage of a "service, program, or

15  activity."  *Id*. (citing *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (finding that "the

16  phrase 'services, programs, or activities' encompasses virtually everything that a public entity

17  does" and "include[s] all of the activities of a public entity."); *Innovative Health Sys., Inc. v. City

18  of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997) (finding that the phrase "programs, services, or

19  activities" is "a catch-all phrase that prohibits discrimination by a public entity, regardless of the

20  context"), *superseded on other grounds, Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171 n. 7

21  (2d Cir. 2001).  The *Barden* court wrote that "[t]he focus of the inquiry, therefore, is not so much

22  on whether a particular public function can technically be characterized as a service, program, or

23  activity, but whether it is " 'a normal function of a governmental entity.' " *Barden*, 292 F.3d at

24  1076 (quoting *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725,

25  731 (9th Cir. 1999)).

26         The Court need not decide this issue: even if the service is "voting," one of the central

27  features of voting, and one of its benefits, is voting privately and independently.  Defendants do

28  not dispute that on any given election day in the United States, most voters at the polls cast their

United States District Court
Northern District of California

United States District Court
Northern District of California

1  ballots in private, without threat of interference by poll workers, the government, or curious

2  onlookers.  The provision and maintenance of voting systems that allow for such privacy is "a

3  normal function of a government entity."  *Barden*, 292 F.3d at 1076.  Indeed, since the early part

4  of the Twentieth Century, every State in this country has employed use of the secret ballot, also

5  known as the "Australian ballot," for the majority of voters at the polls.  John C. Fortier &

6  Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*,

7  36 U. MICH. J.L. REFORM 483, 490 (2003) (citing L.E. Fredman, *The Australian Ballot: The Story*

8  *of an American Reform*, MICHIGAN STATE UNIVERSITY PRESS, 30-31 (1968)).

9       Accordingly, under the terms of the ADA or the Rehabilitation Act, the covered entity

10  must provide meaningful access to private and independent voting.  Thus conclusion is buttressed

11  by an analysis of the implementing regulations of the ADA.  The DOJ's regulations implementing

12  the ADA must be accorded *Chevron* deference "unless they are arbitrary, capricious, or manifestly

13  contrary to the statute."  *K.M.*, 725 F.3d at 1096.

14       Under the effective communication regulation, Defendants are required to provide

15  auxiliary aids "where necessary to afford individuals with disabilities … *an equal opportunity to*

16  *participate in, and enjoy the benefits of*, a service, program, or activity of a public entity."  28

17  C.F.R. § 35.160(b)(1) (emphasis added).  Thus, even if the "service, program, or activity"

18  provided by the County of Alameda is narrowly defined as "voting," the County has allegedly

19  failed to provide Plaintiffs with the auxiliary aid necessary to provide them with "an equal

20  opportunity to participate in, and enjoy the benefits of" voting.  *Id.*; *see also* 28 C.F.R. §

21  35.130(b)(1)(ii) (prohibiting a public entity from providing any "aid benefit, or service that is *not*

22  *equal* to that afforded others") (emphasis added).

23       Defendants argue that, with the assistance of a third party, Plaintiffs were provided an

24  equal opportunity to vote at the November 6, 2012 Election.  However, requiring blind and

25  visually impaired individuals to vote with the assistance of a third party, if they are to vote at all,

26  at best provides these individuals with an inferior voting experience "not equal to that afforded

27  others." 28 C.F.R. § 35.130(b)(1)(ii).  Blind and visually impaired voters are forced to reveal a

28  political opinion that others are not required to disclose.  Thus, the County cannot fulfill its

11

obligation to ensure effective communication by providing third party assistants to blind and visually impaired voters, because "[i]n order to be effective, auxiliary aids and services must be provided … in such a way as to protect the *privacy and independence* of the individual with a disability." 28 C.F.R. § 35.160(b)(2) (emphasis added).

An express purpose of the Rehabilitation Act is "to empower individuals with disabilities to maximize … independence, and inclusion … into society, through … the guarantee of equal opportunity." 29 U.S.C. § 701(b)(1)(F). In *American Council of the Blind v. Paulson*, the D.C. Circuit held that this purpose of the Rehabilitation Act was frustrated by the fact various denominations of United States currency are not readily identifiable by the blind and visually impaired. 525 F.3d 1256 (D.C. Cir. 2008). The court found that requiring blind and visually impaired individuals to either buy an expensive currency counter or rely on the kindness of strangers was in violation of the Rehabilitation Act. The court wrote that "the Rehabilitation Act's emphasis on independent living and self-sufficiency ensures that, for the disabled, the enjoyment of a public benefit is *not contingent* upon the cooperation of third persons." *Id.* at 1267-68 (emphasis added). The same reasoning applies here.

Moreover, the regulations require auxiliary aids so that individuals with disabilities may "enjoy the benefits of" a government service. 28 C.F.R. § 35.160(b)(1). In Title III cases, Ninth Circuit has not lightly construed the regulations' mandate that individuals be able to "enjoy" the experience. In interpreting Title III's requirement that individuals with disabilities be allowed "the full and equal enjoyment" of a public accommodation, the Ninth Circuit has required movie theaters to offer seating not only in the front row of a theater, *see Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.,* 339 F.3d 1126, 1133 (9th Cir.2003), and further required a movie theater to provide seating adjacent to wheelchair seating so a disabled individual may "enjoy" the company of his wife, *Fortyune v. American Multi–Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004). Even if blind and visually impaired voters can communicate their votes with the assistance of third parties, they certainly cannot "enjoy the benefits of" the secret ballot afforded to most other voters.

Even if Plaintiffs are entitled to vote privately and independently under the ADA and

1   Rehabilitation Act, Defendants argue there was no discrimination because, according to the

2   Complaint, Defendants provided at least one accessible voting machine at each polling site during

3   the last two election cycles. Compl. ¶ 31. Plaintiffs also, however, plausibly allege that the

4   County failed to properly train poll workers on how to operate the accessible features of the voting

5   machines, failed to provide technical assistance when needed, and failed to provide adequate

6   maintenance or replacement machines. *See id*. ¶ 36. The ADA's implementing regulations

7   require public entities to "maintain in operable working condition those features of facilities and

8   equipment that are required to be readily accessible to and usable by persons with disabilities." 28

9   C.F.R. § 35.133(a). While this requirement "does not prohibit isolated or temporary interruptions

10  in service or access due to maintenance or repairs," *see id*. § 35.133(b), the duration of, frequency

11  of, and reason for the failure of accessible voting machines to operate properly is a question of

12  fact. Assuming Plaintiff's allegations to be true, the accessible voting machines were not

13  inoperable due to an "isolated or temporary interruption … due to maintenance or repairs." *See id.*

14      Having found that Plaintiffs sufficiently allege they were excluded from the County's

15  service of providing a private and independent voting system for voters at the polls, the next

16  question is whether providing fully operable accessible voting machines at every polling site on

17  Election Day is a "reasonable modification … necessary to avoid discrimination on the basis of

18  disability…." 28 C.F.R. § 35.130(b)(7). A proposed modification is unreasonable, and the

19  County need not undertake the action, if "it can demonstrate [that the modification] would result in

20  a fundamental alteration in the nature of a service, program, or activity or in undue financial and

21  administrative burdens." 28 C.F.R. § 135.164.

22      Defendants do not argue that providing a functional, accessible voting machine at every

23  polling site on Election Day will be an undue burden or fundamental alteration. Nor should they

24  on a motion to dismiss, in light of the fact they bear the burden of proof on this point. *K.M.*, 725

25  F.3d at 1096 (citing 28 C.F.R. § 135.164). However, Defendants do note that no other court has

26  previously held that the ADA and Rehabilitation Act require the provision of accessible voting

27  machines. While this much is true, and the Court discusses differing views below, it is not

28  surprising in light of recent technological advancements. According to the Complaint,

1   technological developments make accessible voting machines at every polling site a feasible

2   reality, and not a fundamental alteration or an undue burden.  *See* Compl. ¶¶ 4-5, 35.

3           The legislative history of the ADA reveals that Congress intended for accommodations

4   provided to individuals with disabilities to "keep pace with the rapidly changing technology of the

5   times":

6               The Committee wishes to make it clear that technology advances
                can be expected to further enhance options for making meaningful
7               and effective opportunities available to individuals with disabilities.
                Such advances may require public accommodations to provide
8               auxiliary aids and services in the future which today they would not
                be required because they would be held to impose undue burdens on
9               such entities.

10              Indeed, the Committee intends that the types of accommodations
                and services provided to individuals with disabilities, under all of
11              the titles of this bill, should keep pace with the rapidly changing
                technology of the times.
12

13  H.R. Rep. 101–485(II), at 108 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391.

14          Indeed, in the context of Title III of the ADA, the Ninth Circuit has twice held that

15  accommodations provided to individuals with disabilities must change as technology progresses.

16  In *Baughman v. Walt Disney World Company*, the Ninth Circuit considered whether Disneyland

17  was required to allow an individual to use a standing "Segway" in the amusement park in light of

18  the fact she was uncomfortable when sitting in a wheelchair.  685 F.3d 1131 (9th Cir. 2012).  The

19  Ninth Circuit noted that "[a]s new devices become available, public accommodations must

20  consider using or adapting them to help disabled guests have an experience more akin to that of

21  non-disabled guests."  *Id.* at 1135.  Moreover, in *Enyart v. Nat'l Conference of Bar Examiners,*

22  *Inc.*, the Ninth Circuit rejected the argument that the provision of auxiliary aids contemplated in

23  the ADA's implementing regulations are sufficient because "assistive technology is not frozen in

24  time: as technology advances, testing accommodations should advance as well."  630 F.3d 1153,

25  1163 (9th Cir. 2011); *see also Am. Council of Blind v. Astrue*, No. 05-4696-WHA, 2009 WL

26  3400686, at *20 (N.D. Cal. Oct. 20, 2009) (holding that while the Social Security

27  Administration's practice of reading notices to blind individual was once sufficient, reading letters

28  over the phone no longer constituted meaningful access because "great strides have been made in

United States District Court
Northern District of California

14

1   computer-aided assistance for the blind….").

2          Defendants cite a handful of cases in support of their position.  Not one of these cases,

3   however, decided the same issue presently before this Court, and should be distinguished on their

4   facts and/or distinct legal analyses.  To the extent these cases do stand for the proposition that the

5   ADA and Rehabilitation Act do not provide the blind and visually impaired a right to independent

6   and private voting, the Court must disagree with the reasoning.

7          Defendants primarily rely on *American Association of People with Disabilities v. Shelley*,

8   324 F.Supp.2d 1120 (C.D. Cal. 2004), a case in which blind and visually impaired voters sought a

9   temporary restraining order against California's Secretary of State after the issuance of two

10  directives decertifying direct recording electronic ("DRE") voting machines for use in the

11  November 2004 election.  Although a type of DRE was conditionally certified in 2003, its use in

12  the March 2, 2004 primary revealed "problems in the areas of testing and certification of software,

13  reliability, accuracy, training, and security."  *Id*. at 1124.  The court denied the temporary

14  restraining order in part because the plaintiffs' interest in voting privately and independently was

15  outweighed by the public interest in the accuracy of the 2004 election.  *Id*. at 1131.

16         Defendants also cite *Taylor v. Onorato*, 428 F.Supp.2d 384 (W.D. Pa 2006), a case in

17  which plaintiffs sought a preliminary injunction enjoining the County of Allegheny from

18  switching from lever voting machines to touch screen voting machines because blind and visually

19  impaired individuals would not be able to vote independently with the touch screen voting

20  machines.  The plaintiffs primarily based the lawsuit on § 301 of HAVA, but the *Onorato* court

21  found that HAVA contained no private cause of action.  *Onorato*, 428 F.Supp.2d at 386-87.  The

22  ADA and Rehabilitation Act claims in *Onorato* did not have a strong factual basis in light of the

23  fact that "disabled persons cannot vote privately and independently on the lever machines either."

24  *Id*. at 388.  Here, the opposite is true−accessible voting machines do afford blind and visually

25  impaired voters an opportunity to case a secret ballot.

26         Of course, Defendants cite the *Shelley* and *Onorato* decisions for the courts' additional

27  holdings that the plaintiffs would not prevail on the merits of their ADA and Rehabilitation Act

28  claims.  The *Shelley* court wrote:

United States District Court
Northern District of California

15

> [T]he ADA does not require accommodation that would enable disabled persons to vote in a manner that is comparable in every way with the voting rights enjoyed by persons without disabilities. Rather, it mandates that voting programs be made accessible, giving a disabled person the opportunity to vote. Nothing in the Americans with Disabilities Act or its Regulations reflects an intention on the part of Congress to require secret, independent voting. Nor does such a right arise from the fact that plaintiff counties attempted to provide such an accommodation.

*Id.* at 1126. In *Onorato*, the court used almost identical language to find that "[n]either the Americans With Disabilities Act nor the Rehabilitation Act require an accommodation that enables disabled persons to vote in a manner that is comparable in every way with the manner in which persons without disabilities vote. Rather, the statutes mandate only that disabled persons are given the opportunity to vote." *Onorato*, 428 F.Supp.2d at 388.

The Court respectfully disagrees. Neither the ADA nor the Rehabilitation Act provides a set of freestanding rights, such as the right to vote, or the right to vote independently. Nor do the ADA and Rehabilitation Act purport to name the various rights of individuals with disabilities in an exhaustive list. Title II of the ADA and § 504 of the Rehabilitation Act grant individuals with disabilities the right to reasonable modifications to have meaningful access to a covered entity's services, programs and activities, so long as that modification will not constitute an undue burden or fundamentally alter the nature of such program or activity−all without naming a particular service in the statute. Moreover, as discussed above, this Court concludes that voting privately and independently is one of the central features of voting which must be accorded so long as the modification is not an undue burden or a fundamental alteration of the service.

Defendants also cite a case from the Sixth Circuit which appears to hold that blind and visually impaired individuals are not entitled to private and independent voting under the ADA and/or Rehabilitation Act. *See Nelson v. Miller*, 170 F.3d 641 (6th Cir. 1999). The *Nelson* court, however, never specifically considered whether, standing alone, the ADA or Rehabilitation Act required private and independent voting because the plaintiffs in *Nelson* admitted that "Congress [never] intended the ADA or [Rehabilitation Act] to specifically impose a right to secret ballot voting for blind voters *in all states.*" *Id.* at 650 (quoting Plaintiff-Appellants' Brief) (emphasis

1    added in opinion).  Plaintiffs premised the entire ADA/Rehabilitation Act analysis on the

2    provisions of the Michigan Constitution.  Therefore, the Sixth Circuit narrowed the analysis to

3    whether the Michigan Legislature violated the Michigan Constitution's mandate "to preserve the

4    secrecy of the ballot," MICH. CONST. art. 2 § 4, and found that it did not.  *Id.*

5         Defendants also cite a case from the Eleventh Circuit which arose when Florida, after the

6    2000 elections, sought to implement the use of the optical scan voting machines to solve the

7    problem of "hanging chads."  *See American Association of People with Disabilities v. Harris*, 647

8    F.3d 1093 (11th Cir. 2011).  The plaintiffs, blind and visually impaired voters of Florida, argued

9    that the optical scan voting machines, by not enabling them to vote privately, violated § 12132 of

10   the ADA, as well as regulations governing the alteration of facilities (28 C.F.R. § 35.151) and the

11   provision of auxiliary aids for effective communication (28 C.F.R. § 35.160).

12        The district court separately considered whether there were violations of the regulations

13   governing the alteration of facilities and effective communication, and granted the plaintiffs their

14   requested injunction solely on grounds that a voting machine is a "facility" under 28 C.F.R. §

15   35.151(b)(1).  Having found that voting machines were a "facility," the district court reasoned

16   that, when altered, a facility must be "readily accessible" to individuals with disabilities "to the

17   maximum extent possible…." *See id.*  The Eleventh Circuit reversed the district court and vacated

18   the injunction, limiting its holding to its conclusion that voting machines are not "facilities" under

19   28 C.F.R. § 35.151(b)(1).  *Harris*, 647 F.3d at 1100-1107; *see also id.* at 1095 ("This opinion …

20   bases [the] outcome exclusively on the ground that voting machines are not 'facilities' under 28

21   C.F.R. § 35.151(b)(1).").  In this case, Plaintiffs do not argue that voting machines are facilities,

22   and do not base their ADA claim on § 35.151.

23        While the holding in *Harris* is limited to the conclusion that voting machines are not

24   "facilities" under § 35.151(b)(1), the Eleventh Circuit agreed with the district court that there was

25   no violation of § 35.160 when the defendants failed to provide accessible voting machines as an

26   auxiliary aid.  *Harris*, 647 F.3d at 1107.  The district court reasoned that because all three

27   individual plaintiffs had been able to vote with third party assistance, there was no evidence they

28   were unable to communicate as effectively as other voters.  *See Am. Ass'n of People With*

United States District Court
Northern District of California

17

*Disabilities v. Hood*, 310 F. Supp. 2d 1226, 1238 (M.D. Fla. 2004).  The Eleventh Circuit believed the district court's reasoning was supported by the Technical Assistance Manual for Title II, issued by the DOJ, which provides an illustrative example endorsing the use of third party assistants in certain circumstances:

> The election procedures specify that an individual who requests assistance will be aided by two poll workers, or by one person selected by the voter.  C, a voter who is blind, protests that this method does not allow a blind voter to cast a secret ballot, and requests that the County provide him with a Brailled ballot.  *A Brailled ballot, however, would have to be counted separately and would be readily identifiable, and thus would not resolve the problem of ballot secrecy.*  Because County X can demonstrate that its current system of providing assistance is an effective means of affording an individual with a disability an equal opportunity to vote, the County need not provide ballots in Braille.

U.S. Dep't of Justice, Title II Technical Assistance Manual 1994 Supplement § II-7.1100 (1994), http://www.ada.gov/taman2up.html (last visited October 6, 2013) (emphasis added).  Interestingly, the Eleventh Circuit quoted almost the entire illustrative example from the Technical Assistance Manual, but omitted the sentence italicized above.  The Eleventh Circuit then reasoned that providing an assistant to a blind voter was sufficient because "the Plaintiff could read the ballot and communicate their choice (i.e., vote)."  *Harris*, 647 F.3d at 1107; *see also Shelley*, 324 F.Supp.2d at 1126 n. 3 (citing the Technical Assistance Manual's comment on Braille as evidence that the ADA only "mandates that voting programs be made accessible, giving a disabled person the opportunity to vote," and does not provide a right to vote privately).

The Court disagrees with the Eleventh Circuit's interpretation of the effective communications regulation.  The illustrative example in the Technical Assistance Manual does not lend any support to the argument that the ADA creates no right for the blind and visually impaired to vote privately and independently.  The sentence omitted in the Eleventh Circuit's *Harris* opinion shows *why* assistance from a third party is equivalent to providing a Brailled ballot: "A Brailled ballot … would have to be counted separately and would be readily identifiable, *and thus would not resolve the problem of ballot secrecy*."

United States District Court
Northern District of California

Moreover, the example from the Technical Assistance Manual arises in a particular technological circumstance: the requested modification is a Brailled ballot. The instant case depends on the technological advances in voting and in the accessibility of voting. The Court does not read the Technical Assistance Manual to exclude all technological modifications that might provide a more secret and independent ballot.

There are also substantial differences between Brailled ballots and accessible voting machines. Indeed, Judge Alsup from this district, after presiding over a bench trial, wrote in his findings of fact that "[l]ess than ten percent of the blind and visually impaired can read Braille." *Am. Council of Blind v. Astrue*, No. 05-04696 WHA, 2009 WL 3400686, at *8 (N.D. Cal. Oct. 20, 2009). Judge Alsup explained:

> Some blind and visually impaired individuals, especially those who are blind early in life, learn Braille in school. Those who learn it early can read it very quickly, effectively at a rate of 200 or 300 words a minute, including tables and charts. Those who have lost their vision later in life are less likely to learn Braille or, if they do, they usually cannot read it as fast.

*Id*. at *9. Thus, not only do Brailled ballots, unlike accessible voting machines, fail to allow the blind and visually impaired to cast a secret ballot, Brailled ballots can also only be used by a fraction of the voters who would use an accessible voting machine.

The Court also believes that the *Harris* court's narrow interpretation of the effective communications regulation conflicts with the language of the regulation. As discussed above, the regulation specifies that "[i]n order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2). A "public entity shall give primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2). Moreover, auxiliary aids must "afford individuals with disabilities …. an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

Finally, the Court addresses Defendants' argument that the ADA and Rehabilitation Act should be interpreted in conjunction with HAVA, which requires an accessible voting machine at

19

1   each polling site, but lacks a private cause of action. *See* 42 U.S.C. § 15511 (providing that the

2   "Attorney General may bring a civil action against any State….."); *Onorato*, 428 F.Supp.2d at 386-

3   87 (holding that HAVA contains no private cause of action); *cf. Crowley v. Nevada ex rel. Nevada*

4   *Sec'y of State*, 678 F.3d 730, 736 (9th Cir. 2012) ("we need not decide whether Crowley has a

5   private cause of action under HAVA."). Defendants contend that because HAVA expressly

6   requires the provision of accessible voting machines, but the ADA and Rehabilitation Act do not,

7   the Court should infer that Congress intended to exclude this requirement in the ADA and

8   Rehabilitation Act.

9        Defendants' argument assumes that the text of HAVA "conflicts" with that of the ADA

10  and Rehabilitation Act. The Court finds no such conflict. The HAVA mandates the provision of

11  accessible voting machines for use by blind and visually impaired voters. The ADA mandates that

12  individuals with disabilities be provided "meaningful access" to public services, so long as the

13  modification providing such access does not "fundamentally alter" the nature of the service. 28

14  C.F.R. § 35.130(b)(7). While these statutory schemes certainly overlap, they do not conflict. At

15  best, the ADA and Rehabilitation Act differ from HAVA in that they do not include a specific

16  mandate for accessible voting machines. That should hardly be surprising, however, given that

17  accessible voting machines were invented long after both the Rehabilitation Act and ADA became

18  law.

19       Accordingly, the Court finds that Plaintiffs have sufficient stated a claim under the ADA

20  and Rehabilitation Act.

21       **C.    State Law Claims**

22       Defendants also contend that Plaintiffs fail to state a claim under California Elections Code

23  § 19227 and California Government Code § 11135. The Court addresses Plaintiffs' allegations

24  under each statute below.

25       **1.    California Government Code § 11135**

26  Section 11135 of the California Government Code provides, in relevant part, as follows:

27       (a) No person in the State of California shall, on the basis of race,
    national origin, ethnic group identification, religion, age, sex, sexual
28       orientation, color, genetic information, or disability, be unlawfully

United States District Court
Northern District of California

1
2
3

> denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Notwithstanding Section 11000, this section applies to the California State University.

4
5
6
7
8

> (b) With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

9   Cal. Gov't Code § 11135.  Subdivision (b) of § 11135 states that a violation of Title II of the ADA

10  is a violation of § 11135.  Subdivision (b) also states that California law may provide greater

11  protections than the ADA.  *See id.*

12       Defendants contend that Plaintiffs fail to state a claim under § 11135 because they fail to

13  state claim under Title II of the ADA.  Having found that Plaintiffs state a claim under the ADA,

14  the Court also finds that Plaintiffs state a claim under § 11135, and Defendants' argument fails.

15       **2.       California Elections Code § 19227**

16  Section 19227 of the California Elections Code provides as follows:

17
18
19
20
21

> (a) The Secretary of State shall adopt rules and regulations governing any voting technology and systems used by the state or any political subdivision that provide blind and visually impaired individuals with access that is equivalent to that provided to individuals who are not blind or visually impaired, including the ability for the voter to cast and verify all selections made by both visual and nonvisual means.

22
23

> (b) At each polling place, at least one voting unit approved pursuant to subdivision (a) by the Secretary of State shall provide access to individuals who are blind or visually impaired.

24
25
26
27

> (c) A local agency is not required to comply with subdivision (b) unless sufficient funds are available to implement that provision. Funds received from the proceeds of the Voting Modernization Bond Act of 2002 (Article 3 (commencing with Section 19230)), from federal funds made available to purchase new voting systems, or from any other source except the General Fund, shall be used for that purpose.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Cal. Elec. Code § 19227.

2         Defendants argue that Plaintiffs must plead three elements to state a claim under § 19227:

3    (1) rules and regulations adopted by the Secretary of State governing the relevant voting

4    technology; (2) failure to provide a voting unit at each polling place; and (3) sufficient funds for

5    the local entity to comply with provisions.  Defendants contend that Plaintiffs fail to plead the first

6    and third elements of their claim under § 19227.

7         The Court agrees with Defendants.  Plaintiffs have not alleged, as required by subdivision

8    (c), that sufficient funds are available to implement the objectives of subdivision (b).  Cal. Elec.

9    Code § 19227(c).  *See id.* § 19227(c).    Plaintiffs have identified no "rules or regulations" adopted

10   by the Secretary of State.  *See id.* § 19227(a).  Plaintiffs' failure to do so is fatal to the § 19227

11   claim because subdivision (b), which requires at least one voting unit accessible to the blind and

12   visually impaired, also requires that the one voting unit be "approved pursuant to subdivision (a)

13   by the Secretary of State[.]"  *Id.* § 19227(b).  This was, at least, the interpretation of California's

14   Voting Modernization Board[4] in 2004:

15            It should also be noted that until the Secretary of State's Office
              formally adopts the regulations outlining the requirements to make
16            voting systems equally accessible to persons who are blind and
              visually impaired, as required by Elections Code § 19227(a), the
17            requirements of sub-section (b), to have one accessible voting
              equipment in each polling place, would not be enforceable.
18

19   Voting Authorization Board, Meeting Staff Report, July 22, 2004, available at

20   http://www.sos.ca.gov/elections/vma/pdf/vmb/documents/vmb_authority_report.pdf (last visited

21   October 8, 2013).

22

23

24   _____

          [4] "The Voting Modernization Board (VMB) was established by the passage of Proposition
25   41 – Voting Modernization Act of 2002 ("Act"), approved by the voters on March 5, 2002. The
     purpose of this Act was to allow the state to sell $200 million in general obligation bonds to assist
26   counties in the purchase of updated voting systems." Voting Authorization Board, Meeting Staff
     Report, July 22, 2004, available at http://www.sos.ca.gov/elections/vma/pdf/vmb/documents/
27   vmb_authority_report.pdf (last visited October 8. 2013).

28
                                              22

Defendants also argue that Plaintiffs allegations show that Defendants provided accessible voting machines in compliance with subdivision (b).  However, § 19227 does not merely require one accessible voting machine at each polling site.  Rather, subdivision (b) expressly requires that the voting unit "*provide access* to individuals who are blind or visually impaired."  Cal. Elec. Code § 19227(b).  An accessible voting machine that, on a systemic level, cannot be activated by poll workers does not "provide access to individuals who are blind or visually impaired."  *Id*.

Nevertheless, because there are no implementing regulations, Plaintiffs' claim under California Elections Code § 19227 is dismissed with prejudice.

**V.  CONCLUSION**

For the reasons stated below, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.  Defendants have twenty (20) days from the date of this Order to file an answer to the complaint.

**IT IS SO ORDERED.**

Dated: October 16, 2013

JOSEPH C. SPERO
United States Magistrate Judge

23